IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RADDISON DESIGN MANAGEMENT, INC., )
assignee of Technomarine International )
Management, Inc., )
 )
            Plaintiff, )
   v. )  C.A. No. 07-92 Erie
 )  Judge McLaughlin
BOB CUMMINS, individually and d/b/a BOB )
CUMMINS CONSTRUCTION CO., )
 )
 )
            Defendant. )

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

### I.    BACKGROUND

This action arises out of an agreement entered into between Defendant, Bob Cummins Construction Company and, individually, Bob Cummins (collectively, "Cummins") and Gestion Technomarine International Inc. ("Technomarine"). Cummins, as general contractor, subcontracted with Technomarine in December, 2005, for the design, manufacture and delivery of a floating dock system for the Wolf Run Marina project ("Project") for the United States Department of Agriculture, Forest Service. Technomarine, a Canadian company, agreed to perform the subcontract for $678,325.00. (See Complaint, Ex. A, Subcontract). The subcontract included the following non-assignment clause:

> **Assignment.** Neither this Agreement nor any portion of the proceeds may be assigned by Supplier [Technomarine] without prior notice and approval of Contractor [Cummins].

1

(Id).

Technomarine's performance under the subcontract suffered, and Cummins became concerned about defective, incomplete and delayed performance. (See Affidavit of Bob Cummins, ¶¶ 11-17). Cummins was forced to compensate for Technomarine's failure to timely pay its own subcontractors and failure to undertake warranty services for its on work. (Id.) On March 6, 2006, Technomarine commenced bankruptcy proceedings in the provincial Court of Quebec, District of Joliette. (See Affidavit of Michel Lavoie, ¶ 4). On March 15, 2006, a bankruptcy was filed for Technomarine and Raymond Chabot, Inc., was appointed trustee in bankruptcy. Michel Lavoie was named the responsible person. On April 5, 2006, pursuant to a formal bid offering, the trustee sold to Plaintiff Raddison Design Management, Inc., ("Raddison") "all assets, accounts receivable, outstanding contracts, know-how, trademarks, equipment, licenses, etc. of Technomarine International Management Inc." (Cummins Aff., Ex. 1).

On May 1, 2007, Raddison filed the instant Complaint seeking payment under the subcontract and claiming status as an assignee of Technomarine. On July 16, 2007, Cummins filed the instant Motion to Dismiss for lack of subject matter jurisdiction. Cummins asserts that Raddison lacks standing because the assignment of the subcontract was invalid as a matter of state, federal and international law.[1] An oral hearing on the motion took place on October 30, 2007.

## II. STANDARD FOR REVIEW

Subject matter jurisdiction is a mandatory prerequisite to maintaining an action in federal court. Robinson v. Dalton, 107 F.3d 1018, 1020 (3rd Cir. 1997). Where a court lacks subject matter jurisdiction over a case, the case must be dismissed. A federal court may dismiss for lack of

---

[1] Although Cummins initially disputed receiving notice of the bankruptcy proceedings, the record suggests otherwise and Cummins, through counsel, conceded at oral argument that he had received notice. (Lavoie Aff., ¶¶ 10-16, Ex. C-E; see also Transcript, Hearing on Motion to Dismiss, October 30, 2007, pp. 4-5).

jurisdiction only if the claims are "insubstantial on their face," rather than "merely because the legal theory alleged is probably false." St. Vincent Health Center v. Shalala, 937 F.Supp. 496, 501 (W.D. Pa. 1995) (quoting Hagans v. Lavine, 415 U.S. 528 (1974); Kulick v. Pocono Downs Racing Ass'n, 816 F.2d 895, 899 (3rd Cir. 1987). Thus, the threshold for dismissal on a motion attacking subject matter jurisdiction is lower than for a Rule 12(b)(6) motion. NMC Homecare, Inc. v. Shalala, 970 F.Supp. 377, 382 (M.D. Pa. 1977); St. Vincent, 937 F.Supp. at 501 (W.D. Pa. 1995). While the former deals with the ability of the court to entertain the matter, the latter deals with the merits of the claim itself. St. Vincent, 937 F.Supp. at 501.

### III. ANALYSIS

In the motion to dismiss, Cummins alleges that Raddison is an invalid assignee of the subcontract and, therefore, lacks standing to pursue payment on that instrument. The three requirements for Article III standing are: (a) an injury-in-fact, which is a concrete invasion of a legally protected interest; (2) a causal connection between the injury and the defendants' conduct; and (3) a substantial likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). In addition, in Pennsylvania, an assignee of contractual rights must demonstrate the validity of his ownership of the claim in order to maintain the cause of action. Federal Deposit Ins. Corp. v. Barness, 484 F.Supp. 1134, 1150 (E.D. Pa. 1980).[2]

The assignment at issue in this case occurred during the liquidation and sale of Technomarine's assets in the course of a Canadian bankruptcy proceeding. As such, in order to attack the assignment's validity, Cummins must demonstrate that the results of the Canadian bankruptcy proceeding are not entitled to comity from a court sitting in the United States. Comity is recognition by one nation, within its own territory, of the validity of legislative, executive or judicial acts of another nation. Hilton v. Guyot, 159 U.S. 113 (1895). Under principles of comity,

---

[2] The parties agree that Pennsylvania law governs the substantive issues in this case.

3

foreign judgments will not be enforced where a foreign judgment violates "a positive, well defined, universal public sentiment, deeply integrated in the customs and beliefs of the people [of Pennsylvania] and in their conviction of what is just and right and in the interests of the public weal." Somportex Ltd. v. Phila. Chewing Gum Corp., 318 F.Supp. 161 (E.D. Pa. 1970) (quoting Christoff Estate, 192 A.2d 739 (Pa. 1963)).

In determining whether to extend comity and recognize foreign judgments, courts examine whether: (1) the foreign judgment was rendered by a court of competent jurisdiction; (2) the judgment is supported by due allegations and proof; (3) the relevant parties had an opportunity to be heard; (4) the foreign court follows procedural rules; and (5) the foreign proceedings are stated in a clear and formal record. Int'l Transactions, Ltd. v. Embotellardora Agral Regiomontana, 347 F.3d 589, 594 (5th Cir. 2003); Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435 (3rd Cir. 1972). Thus, a foreign judgment "cannot be enforced in a U.S. court unless it was obtained under a system with procedures compatible with the [United States law] requirements of due process of law." Int'l Transactions, 347 F.3d at 594.

United States courts "have long extended comity to foreign bankruptcy actions," Victrix S.S. Col., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 714 (2nd Cir. 1987), so as to enable "assets of the debtor to be disbursed in an equitable, orderly, and systemic manner, rather than in a haphazard, erratic or piecemeal fashion." Smith v. Dominion Bridge Corp., 33 Bankr. Ct. Dec. 1263 (E.D. Pa. 1999). It is a well-settled principle of comity that "federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat the claims of local creditors." Victrix, 825 F.2d at 714; see also Philadelphia Gear Corp. v. Philadelphia Gear De Mexico, 44 F.3d 187, 193 (3rd Cir. 1994) ("[W]hen the foreign bankruptcy court shares our 'fundamental principle that assets be distributed equally among creditors of similar standing,' we should be inclined to extend comity.") (citing Remington Rand v. Business Sys. Inc., 830 F.2d 1260, 1266 (3rd Cir. 1987)). Accordingly, American federal courts have uniformly and consistently granted comity to Canadian bankruptcy proceedings because the Canadian Bankruptcy & Insolvency Act,

like the United States Bankruptcy Code, "contains a comprehensive procedure for the orderly marshaling and equitable distribution of the Canadian debtor's assets. . .". See, e.g., In re Davis, 191 B.R. 577, 587 (S.D.N.Y. 1996).

Cummins primarily argues that the assignment should not be accorded comity because to do so would violate Pennsylvania public policy. "It is a well established rule of law that a court will not enforce a foreign judgment, be it of a sister state or foreign nation, if to do so would violate the forum's public policy." Somportex, 318 F.Supp. at 168 (citing Christoff Estate, 192 A.2d at 739). In the bankruptcy context, "federal courts must be careful not to force 'American creditors to participate in foreign proceedings in which their claims will be treated in some manner inimical to this country's policy of equality.'" Philadelphia Gear, 44 F.3d at 193 (quoting Remington, 830 F.2d at 1271) (citations omitted). See also Republic of the Philippines v. Westinghouse Elect. Corp., 43 F.3d 65, 75 (3rd Cir. 1994) (holding that "principles of comity cannot compel a domestic court to uphold foreign interests at the expense of the public policies of the forum state."). The Pennsylvania Supreme Court has stated that it will not enforce a foreign judgment which violates "a positive, well defined, universal public sentiment, deeply integrated in the customs and beliefs of the people [of Pennsylvania] and in their conviction of what is just and right and in the interests of the public weal." Somportex, 318 F.Supp. at 168 (quoting Christoff Estate, 192 A.2d at 739). The Third Circuit has recognized, however, that the public policy exception under Pennsylvania law is narrow:

> The limited scope of public policy as a controlling principle of Pennsylvania jurisprudence was underscored by Justice Stern in Mamlin v. Genoe, 340 Pa. 320, 325, 17 A.2d 407, 409 (1941):
>
>> "It is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring . . . Familiar illustrations are those involving unreasonable restraints of marriage or of trade, collusive arrangements for obtaining divorces, suppression of bids for public contracts, interference with freedom of conscience or religion . . . Only in the clearest cases, therefore, may a court make an alleged public policy the basis of judicial decision."

Somportex, 453 F.2d at 443 n. 15 (quoting Mamlin, 340 Pa. at 325).

Cummins asserts that, pursuant to the United States Bankruptcy Code, a purported assignment of an executory contract, such as the Cummins/Technomarine Subcontract, is invalid where prohibited by "applicable non-bankruptcy law." 11 U.S.C. § 365(c)(1). Applicable non-bankruptcy law, according to Cummins, includes Pennsylvania's common law which recognizes that a right "may not be effectively assigned where such assignment is prohibited by the writing creating the right." Nolan v. J. & M. Doyle Co., 13 A.2d 59 (Pa. 1940). Cummins asserts that the Canadian trustee's assignment of the Subcontract to Raddison violated this common law principle and in so doing violated Pennsylvania's public policy. We disagree.

In Somportex, for example, the appellant sought to have an English judgment declared unenforceable because it included damages for loss of good will and attorney's fees, both of which are not recoverable under Pennsylvania law. The Third Circuit affirmed the district court's ruling that the English judgment did not violate Pennsylvania public policy:

> [W]hile Pennsylvania may not agree that these elements should be included in damages for breach of contract, the variance with Pennsylvania law is not such that the enforcement "tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy." Goodyear v. Brown, 155 Pa. 514, 518, 26 A. 665, 666 (1893).

Somportex, 453 F.2d at 443 (quoting Somportex, 318 F.Supp. at 169). We conclude that, like the contractual damage award in Somportex, the enforcement or non-enforcement of a contractual non-assignment clause does not implicate issues which are so injurious or critical to public health and morals as to trigger the narrowly defined public policy exception.

Alternatively, Cummins' position fails on the merits. Section 365(c)(1) of the United States Bankruptcy Code bars the assignment of an executory contract where prohibited by "applicable law":

6

> (a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
> \* \* \* \* \* \* \* \*
> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegations of duties; and
> (B) such party does not consent to such assumption or assignment.....

11 U.S.C. § 365(a), (c). Cummins cites <u>In re: Allentown Abassadors, Inc</u>., 361 B.R. 422 (E.D. Pa. 2007), for the proposition that the phrase "applicable law" in § 365(c)(1)(A) includes both statutory and Pennsylvania common law. Accordingly, he argues that the powers of a bankruptcy trustee to assign an executory contract are limited by Pennsylvania common law where the terms of the contract contain language prohibiting assignment.

This argument, however, is belied by the statutory history of § 365. A review of the notes pertaining to Senate Report No. 95-989 discloses the following:

> Subsection (c) prohibits the trustee from assuming or assigning a contract or lease if applicable nonbankruptcy law excuses the other party from performance to someone other than the debtor, unless the other party consents. This prohibition applies only in the situation in which applicable law excuses the other party from performance *independent of any restrictive language in the contract or lease itself*.

11 U.S.C. § 365, History; Ancillary Laws and Directives, Note 1, Prior law and revision. *Legislative Statements, Senate Report* No. 95-989 (emphasis added). Moreover, Subsection 2 of § 365(f) contains language rendering certain provisions of executory contracts or lease unenforceable where those provisions would affect a trustee's right to assume or reject the contract:

> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if –
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

This section, which purports to allow the assignment of almost any executory contract notwithstanding "applicable law," seemingly conflicts with Subsection (c), which prohibits assignment where the assignment would be forbidden by "applicable law." As noted by one court, "[w]hat § 365(f)(1) appears to give, § 365(c)(1)(A) seems to take away." Cinicola v. Scharffenberger, 248 F.3d 110, 121 n. 11 (3rd Cir. 2001). However, courts have reconciled the two sections by closely analyzing the meaning of "applicable law" in each section:

> The words "applicable law" in this section mean "applicable non-bankruptcy law." See H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 348 (1977), reprinted in [1978] U.S.Code Cong. & Ad.News 5787, 5963, 6304; S.Rep. No. 95-989, 95th Cong., 2d Sess. 59 (1978), reprinted in [1978] U.S.Code Cong. & Ad.News 5787, 5845. Evidently, the theory of this section is to prevent the trustee from assigning (over objection) contracts of the sort that contract law ordinarily makes nonassignable, i.e. contracts that cannot be assigned when the contract itself is silent about assignment. At the same time, by using the words in (1)(A) 'whether or not the contract prohibits assignment,' the section prevents parties from using contractual language to prevent the trustee from assigning contracts that (when the contract is silent) contract law typically makes assignable. Id. Thus, we must look to see whether relevant nonbankruptcy law would allow Ford to veto the assignment of its basic franchise contract "whether or not" that basic franchise contract itself specifically "prohibits assignment."

In re Pioneer Ford Sales, Inc., 729 F.2d 27, 28 (1st Cir. 1984). The Pioneer Court then further explicated how this distinction eliminates the conflict:

> As a matter of logic, however, we see no conflict, for (c)(1)(A) refers to state laws that prohibit assignment "whether or not" the contract is silent, while (f)(1) contains no such limitation. Apparently (f)(1) includes state laws that prohibit assignment only when the contract is not silent about assignment; that is to say, state laws that enforce contract provisions prohibiting assignment. See 1 Norton, Bankruptcy Law and Practice § 23.14. These state laws are to be ignored. The section specifically excepts (c)(1)(A)'s state laws that forbid assignment even when the contract is silent; they are to be heeded.

Id. at 29.

In Matter of West Electronics, Inc., 852 F.2d 79 (3rd Cir. 1988), the Third Circuit held that a contract between West and the federal government could not be assigned based upon the existence of a statutory provision barring the assignment of such contracts *independent* of any contractual language barring assignment. Id at 83 (citing Pioneer, 729 F.2d at 29). The Court, citing Pioneer approvingly, held that "if non-bankruptcy law provides that the government would have to consent to an assignment of the West contract to a third party, i.e., someone 'other than the debtor or the debtor in possession,' then West, as the debtor in possession, cannot assume that contract. This provision limiting assumption of contracts is applicable to any contract subject to a legal prohibition against assignment." Id. (citing Pioneer, 729 F.2d at 29).

In short, where a law, generally applicable to specific types of contracts, categorically prohibits the assignment of those contracts *regardless* of whether the contract itself contains non-assignment language, that law is enforceable against the trustee in bankruptcy pursuant to Subsection 365(c) to prohibit assignment of the contract. However, where a party relies exclusively on the Pennsylvania common law to enforce a contractual term restricting or prohibiting assignment, such a restriction on assignability is unenforceable against a trustee in bankruptcy pursuant to § 365(f). Notwithstanding the holding in Pioneer and, in our view, its implicit adoption by the Third Circuit in West, Cummins argues that Allentown Ambassadors, a recent Pennsylvania bankruptcy court case, supports its position.

In Allentown Ambassadors, the court read West as "requir[ing] a bankruptcy court evaluating the assumability of an executory contract under § 365(c)(1) . . . to examine the executory contract at issue and determine whether applicable law (*be it statutory or common law*) precludes the assignment of the contract without the consent of the debtor." Id. at 448 (emphasis added). The court further concluded that "[n]othing in West Electronics suggests that [the requisite analysis of applicable law] is anything other than an analysis of the law of assignability as applied to the type of contract at issue." Id. at 29. Cummins urges us to adopt this interpretation of West and hold that

9

"[t]he Third Circuit (as opposed to the First Circuit. . .), has interpreted . . . the language "applicable law" to encompass both statutory *and* common law." (Brief in Support of Motion to Dismiss, p. 12).

Contrary to Allentown Ambassadors, we read West's citation of Pioneer as an implied endorsement of the § 365(c) and (f) analysis contained therein. Indeed, at oral argument, counsel for Cummins recognized that the Third Circuit's decision in West endorsed the approach set forth in Pioneer. (Transcript, pp. 10-12).

Finally, in support of his motion, Cummins contends that Raddison and the Canadian trustee failed to provide adequate assurance that Raddison would cure existing breaches under the Subcontract and provide future performance under the same. The phrase "adequate assurance of future performance," as used in § 365, is "adopted from section 2-609(1) of the Uniform Commercial Code" and "is to be given a practical and pragmatic construction based upon the facts and circumstances of each case." Cinicola, 248 F.3d at 120. A party's satisfaction with such assurances must be based upon reason and not be arbitrary or capricious. Id. In determining whether there has been adequate assurance of future performance of an executory contract, courts have considered the nature of the parties involved, their prior dealings, and the contents of the agreement. See, e.g., In re Yardley, 77 B.R. 643 (Bankr. M.D.Tenn. 1987). Although a trustee and/or debtor need not provide an absolute guarantee of future performance, it must provide more than speculative plans to constitute adequate assurance. Cinicola, 248 F.3d at 120; see also In re Washington Capital Aviation & Leasing, 156 B.R. 167 (Bankr. E.D. Va. 1993).

Here, following the initial letter from the bankruptcy trustee to Cummins informing him of the bankruptcy proceeding, the trustee and Cummins exchanged written communications concerning the ongoing Marina Project. Cummins informed the trustee that he needed several missing parts that Technomarine had neglected to provide in a timely fashion, and indicated that he "hope[d] this can be remedied by Monday the 21st of March so that I can send money and receive the rest of the parts and support." (Lavoie Aff., Exhibit C). The trustee assured Cummins that the parts were available and could be provided as soon as Cummins made payment a some of money that

the trustee believed Cummins owed Technomarine. (Lavoie Affidavit, ¶11-14; Exhibit D). The trustee also requested that Cummins sign an amendment to the Subcontract in which Cummins would have acknowledged that the work performed by Technomarine had been in accordance with the Subcontract. (Id.) Cummins refused to sign the amendment or send the requested payment because he believed that Technomarine's past performance had been deficient and in breach of the Subcontract.

Robert Fortin, Vice-President of Sales and Development for Raddison, stated in his affidavit that he had "numerous conversations" with both Bob Cummins and the trustee wherein he assured them that Raddison had the ability to supply the equipment and perform the job contemplated by the Subcontract. On April 7, 2006, Fortin sent a letter to Cummins wherein he indicated, inter alia, that "[Raddison is] able to continue supply per the contract and fulfill the engagements," that a technician could be sent to assist with installation, that several parts were ready, available, and could begin shipping immediately, and requesting that Cummins contact Raddison to further discuss details relating to the completion of the contract. (Fortin Aff., Exhibit C). Cummins responded by noting that he had already contracted with other subcontractors for performance of the majority of the remaining project, but might be interested in purchasing parts should Raddison be able to provide them immediately. (Fortin Aff., Exhibit D).

Cummins disputes that the communications from the trustee and Fortin constituted adequate assurance, noting that, while general promises and assurances of Raddison's capabilities were offered, no parts were actually provided, no financial assurances were given (such as, for instance, a bond), and no assurance was given that Raddison could correct the breaches already attributed to Technomarine. Cummins further argues that the trustee's insistence that Cummins sign an amendment to the Subcontract representing that Technomarine's performance had been satisfactory failed to provide Cummins any assurance that it's concerns about past delays and defective performance were being properly considered.

We find that, under these facts, adequate assurance was given notwithstanding Cummins' proffered objections to the same. Both Raddison and the trustee represented to Cummins that Raddison could complete work under the Subcontract and, significantly, they offered specific examples of parts and assistance that were immediately available to Cummins once the Subcontract had been assigned. Cummins' decision to seek alternate subcontractors to perform the work does not undercut the adequacy of the assurances provided by Raddison.

### IV. CONCLUSION

For the reasons stated above, Cummins' Motion to Dismiss for lack of subject matter jurisdiction is DENIED.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RADDISON DESIGN MANAGEMENT, INC., assignee of Technomarine International Management, Inc., <br><br> Plaintiff, <br><br> v. <br><br> BOB CUMMINS, individually and d/b/a BOB CUMMINS CONSTRUCTION CO., <br><br> Defendant. | C.A. No. 07-92 Erie <br> Judge McLaughlin |

## ORDER

AND NOW, this 3rd day of January, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Cummins' Motion to Dismiss for lack of subject matter jurisdiction is DENIED.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___